I was about 60. I sat there, ding, ding, ding, ding. It was a happy birthday. I was sitting across the way. Okay, Mr. Castata, Ms. Castata. No, I'm Ms. Moniz. Oh, I'm sorry. I'm on the Your Honors, my name is Eva Nelda Moniz, and I represent the parents of little Zoe C. Zoe was 7 years old with a primary disability of autism and a secondary disability of ADHD when this case began in November 2012. She was retained in the first grade because she was not reading, and her mother, desperate to see progress on the single goal in Zoe's IEP, arranged for private therapy services and then moved her into a private school placement after giving written notice to the school district. Is it the case, as I understand from the briefs, that although there was difficulty in reading that she was doing well enough in the other subjects? Well enough is relative because her grades were in the low 70s across the board. Reading was the lowest? Reading was the lowest, and then math, and science and social studies were also low. Unbelievably, the school district who failed her claimed to the hearing officer in the district court that her absences for private therapy services was a defense to her lack of progress. The district court ignored clear Texas code on this point. The district court erred in its decision and must be reversed or remanded. The district court committed clear error in three ways. First, the district court failed to apply a true de novo review of the facts, instead adopting wholesale verbatim the erroneous facts of the hearing officer. Two, the district court ignored the clear standard of the U.S. Supreme Court rally case, which definitively stands for the view that appropriate is tied to progress from grade to grade. Retention by definition cannot meet that standard. This is a substantive deficiency. Last, the court erred in its analysis of the Michael F. standard. Especially the lack of an individualized program, Zoe had the same single goal as everyone else in her class, and lack of progress from grade to grade, which cannot equal academic benefit. As you know, the district court's review of administrative proceeding in an IDEA case is virtually de novo. In this court, the case applied the summary judgment analysis in Rule 56 of the Federal Rules of Civil Procedure. Let me ask you a question. Yes, sir. Do you agree that since the parents have pulled the child from the public school with a private placement, that they have to first prove that that private placement was appropriate and that the IEP at the public school was inappropriate? Well, first you have to define that the IEP was inappropriate, and then you go to the next step, which is that the private school was appropriate. Well, I'm not trying to sequence them so much as I'm saying that you have to prove both of those items. Yes, sir. Okay. But the district court didn't even address the private school placement. So if the FAPE is provided, whether or not the private school is providing adequate services or whatever is simply not relevant. You don't get there. Yes, sir. If the school was providing FAPE, then . . . So our focus is on FAPE. Yes, sir. All right. However, that is not the appropriate standard of review in an appeal of an IDEA case. The appropriate standard of review is essentially ask the district court to decide the case based on the administrative record. Although the hearing officer's findings should be accorded due weight, the district court must ultimately reach an independent decision based on the preponderance of the evidence. The parent signed the IEP, did she not? The what? The parent signed the IEP on . . . Oh, she disagreed at every ARD. . . on the 26th. On the 26th of October. Oh, 2011. Did she sign that? She signed, but she disagreed. Did she disagree with it in writing or did she just . . . At the end of our ARD papers, our ARD documentation, there's a signature page and you either sign agree or you check agree or disagree. And she checked disagree on every ARD. All right. Did she say why she disagreed? Yes. Some of the ARD documents say she disagreed with the IEP or she disagreed with the eligibility. The eligibility was the biggest concern. She wanted . . . she believed and the evidence shows that Zoe had a reading disability. There's also a reading, a writing, a written expression and a math. But the school district kept saying she didn't have an educational need for those disabilities because . . . and they believed it was a lack of instruction because she was going to private therapy. But the . . . That was later. That was late. That was in 2012 that you went for private therapy, correct? No. She started private therapy as soon as she . . . the school district found her eligible with autism, which was October 26th. Yes. There was two ARDs in October. The first one just found her eligible for ADHD and it was the second one that found her for autism. Her disability was autism and that became the primary disability. Now, on the individualized IEP, they said frequent reminders to stay on task, minimize distractions, written consent presented orally, extra time if needed for completion of assignments, preferential treating, break tasks in manageable segments with immediate feedback on her progress, teacher check for understanding, chunking of assignments, frequent breaks and so on and so on. I mean, what aspect of that would your client have added to the IEP? Those are classroom accommodations that you just mentioned. The IEP goal itself said she had to master the regular ed curriculum at 70 percent. So, she wanted more services in reading. She was provided 30 minutes of inclusion with a teacher who would go into the classroom and work with her, but Zoe's mother believed she needed more than just 30 minutes of instructional support. Is that the difference between this IEP and . . . I mean, is that the deficiency that she's claiming? Yes. That she needed more than 30 minutes? Yes, and that the standard she was measured against was that of regular ed students. At 70 percent, which the regular ed students had the same standard. They only had to master all the classes at 70 percent, too. So, there was really no difference. They get 30 minutes of specialized training with the teacher? No, sir. Okay, well, why was that not satisfactory? She wasn't making progress. She wasn't reading. When her IEP was developed, she could only read the words A and and. And this is after a year of kindergarten, summer school, and going into the first grade. She could write her first name, but not her last. At the time of the withdrawal from the district, the grades in the academic classes, as I understand it, ranged from 85 to 96, and acceptable to exceptional performance in non-academic areas. The parents pulled the child to go to this private school, which is called the Academy for Exceptional Learners. The school has one certified teacher through the Texas TEA, and they do not adopt educational curriculum, and they're not accredited by the Texas Education. Is that true? They do adopt the curriculum. There's more than one certified teacher there. What was the last one? Let's start with the first one. Is that accurate, her academic success at the time of withdrawal? When she withdrew, she was repeating the first grade. So after the whole year, she had come from reading level A to C. When she entered the second year, first grade, she was at level C. That was the mastery level for those first nine weeks. So she had been on grade level since she left. Even with summer school, she went to a level D, but after the first nine weeks, she went back to a level C. Typically, when a child leaves the first grade, they're supposed to be at level I. There was something about that she didn't finish summer school or something? What was that? She had therapy during the summer, too. Her mother had already planned out the therapies. She did attend, I believe it was six of the 12 days. Well, that's not true. She attended more of the days, but she was counted absent because she wasn't there when they took attendance. So her mother had already set the therapy schedule, and she told that to the ARD. She asked them for extended school year services, but the ARD declined that. Her mother believed she needed more individualized attention than a summer school, which would go back to the regular curriculum and without the inclusion support. I believe she was ARDed for inclusion support, but her mother says she never received it. And actually, the teacher never received her IEP goal during the time she was in summer school. What was the difference in teacher-student ratios in the Killeen public schools and the private school? There was 22 kids in her public school classroom. She had between one and four student-teacher ratio in the private school, and many times it was one-to-one. There was maybe like two and a half hours were one-to-one. And even with that one-in-one intensive reading, it took her like six or seven months to get to a level G. What has happened in the private school? She's now reading with all the intensive therapy. The withdrawal was November of whatever it was. I'm sorry? How long has she been in the private school? She was there, I believe, a year and a half. Okay. Well, she's not reading, but I'm getting a little lost in looking at what I'm focusing on is the adequacy of the faith. Yes. Yes, ma'am. And the private school offers, as I recall, a much more favorable teacher-student relationship. Yes, sir. But I'm uncertain in the facts here as to how to gauge the adequacy of that faith, because we're talking about—I've read those numbers, which were certainly adequate, but you explain those as being, well, yes, but she's repeating. Exactly. Right. And you said, well, she had to just learn to read, but now she's reading, but that's over a longer period of time. I'm not sure that—you're showing me in this record that her progress in the private school is proceeding at a better pace than it was in the public school. At the beginning, it didn't. I mean, she needed—actually, when they tested her when she went to the private school, her reading level was back to a pre-K level, and then they worked with her intensively. She was repeating the first grade in the private school. She had to repeat. It took them a while to get her moving and reading. I believe it was about a year and a half before she got through the first-year curriculum. Well, she had to repeat the same first grade that she was making, where she was making these grades in public schools. That was a repeat of the first grade. But at the private school, they individualized it to her needs. They what? They individualized to her needs. They assessed her and realized where her gaps were, where her deficiencies were, and did that. When she was in the public school, it was still the same. She had to meet the regular curriculum standards that everybody else did. Okay. So your quarrel with the IEP was that they did not individualize the curriculum? And the instructional services to her needs, yes. This is the school. How do we measure the consequence of that? She was denied—I mean, she failed and had to be retained. She had to repeat. When she went to private school, she had to repeat, too. Right. But if her IEP had been appropriate to begin with, she should not have been retained. An IEP that's appropriate would have met her needs, and she would have made progress and would not have been retained. Not necessarily. I don't understand. Not necessarily. I mean, in other words, she has to do something herself. Well, yes, sir. Her mother was providing her with ABA therapy, speech, and OT. They were providing additional services. She goes to the private school, and essentially nothing happens any differently until a year and a half later. Well, no. She received intensive services. Well, but it didn't prove her—didn't show any specific benefits. Well, and that's what the mother was saying. She had a learning disability. The school wouldn't recognize that. Well, what is a learning disability? I mean, isn't autism a learning disability? No, it's not. What is the other—what was the other— ADHD. Is that a learning disability? No, it's not. A learning disability or in specific core areas like math, reading, written expression. Those are the three specific learning disabilities that a child can be eligible for special ed services. What is her present situation? She is now back in the public school. Her mother is teaching in a neighboring district, so she took her there. And she's receiving a lot of special ed services there, and she's successful. And what grade is she in now? Fourth. And that's approximately where she should be. She would be in the fifth grade. But she's—you're saying now that she's now back in public schools with an adequate FAPE? That she is back in public—I misunderstood you. She's back in public schools, but she's being taught under a FAPE that you say is acceptable. Yes, an individualized IEP that meets her needs. Yes, sir. Okay. You've saved some time for a bubble. And we will hear from Ms. Mooney. May it please the court, counsel. And as you said, I'm Andrea Mooney, and I represent the Clean Independent School District. And so it's important to note first and foremost, Your Honors, that it's not the school district's job or burden to show that the IEP that it provided to the child was appropriate. The law is very clear that the burden is on the appellant to show that the IEP was inappropriate. And so the Michael F. standards that, Your Honor, Judge, you sat on the panel for in 1997 for the Michael F. case, and that sets forth whether the IEP was appropriate, or in this case, appellant has to show inappropriate. And that just simply means that the student was provided educational benefit. So we get these four factors that tell us whether that occurred or whether it didn't. And the Michael F. case was not unlike this case. It was a student whose parents unilaterally withdrew him and put him into private school. And then the parents went back and requested reimbursement by public expense. And Your Honor, Higginbotham was on that panel that said, no, you did not meet your burden. And as you pointed out earlier, Judge, if you cannot show that the IEP was inappropriate, we don't even get to the second inquiry, which is how appropriate or how wonderful the public school was. And so that's the Michael F. case, and of course it's the foundation of the case that we're talking about today. And so the school district, the hearing officer affirmatively found the school district proved that they met the Michael F. factors. So we carried a burden that we didn't even have. We showed that we provided the student with FAPE, and the district court also said the same and went through a very detailed, I thought, well-thought-out analysis of how we did that, of how we met the Michael F. factors. And so just to kind of go through some of those, individualized, that's the first factor, individualized. Well, the student received seven evaluations in the short period that she was with us, I believe two years. And just to kind of let you know how unusual that is, under the IDEA, we're required to do one reevaluation every three years. So in two years, we did seven evaluations, and they said all different kinds of things. So never once in any of those evaluations, because you were asking about learning disabilities earlier, none of them said learning disabilities. Even the very last independent evaluation that was done never made a conclusive diagnosis of a learning disability. So this was purely the mother's perspective of her opinion, but none of the seven evaluators who are professionals ever found that. And so aside from that, we had eight ARDs, and to show you how unusual that is, the IDEA requires that we have an annual ARD. We had eight in two years, and four, to be fair, four subject to the statute of limitations. And there was a lot of talk in argument and a lot of talk in the brief about an ARD that occurred on October 26, 2011, and the ARDs before that. And both the hearing officer and the district court recognized that there's a statute of limitations that applies here, and it's a year from the date of the filing of the due process action. And the due process wasn't filed until November 14, 2011. So anything before that predates the statute of limitations. And so all the talk about 70 percent, all the talk about, you know, all the evaluations that occurred before, they're not subject, they're past, they predate the statute of limitations. And so the hearing officer didn't consider them, and neither did the district court, and that was why. And so how else did we individualize? Well, the district court set out a really, like I said, a good analysis of what happened. The district looked at student evaluations, we looked at student testing, both formal and informal along the way, parent input, teacher input, all of those things were included whenever we had an ARD meeting, the eight that we had. And so there's, you know, been some talk about, well, the hearing officer never recognized that the student had autism. He used the word alleged. And so what effect does that have? Well, the effect of that has, if the student had autism, then yes, under state law, the district was required to excuse the student's absences. And we did that. We excused absences. But that's not what we're here to litigate today. And nothing in the idea says that a court has to completely not consider absences or not, you know, if the student has autism. And just to tell you, you know, how significant those absences were, because you did allude to them earlier, in the 2011 school year, the student missed 65 days or parts of days, 117 days out of 180 instructional days. And those are days or parts of days she missed. Largely, the testimony shows during language arts. And in an ARD committee meeting, the mother agreed, hey, I'm not going to pull her out anymore for private therapies during language arts. She needs to be able to make progress on her reading. And yet it continued. So then we go to summer school. And what happened there? Well, the student missed six out of 12 days. So it's not very surprising if she's not there to receive the educational content that maybe she's not making progress. And you know what? She was making progress. She was reading. This was left out earlier. She was reading at a reading level D over the summer. So she made progress over the summer. Think of what she could have done if she came for all the days rather than 50%. And then you go to the 12-13 school year, the year that she withdrew. Of the 52 days that she was enrolled in our school district, she came for 37 days. Or she was, excuse me, she was absent for 37 days or parts of days. And so you're looking at 65% of the time gone, 50% of the time gone, 71% of the time gone. Is there an explanation for those absences? I'm sorry, Your Honor. Is there an explanation on the record for those absences? There are, Your Honor. It was that the student was attending private therapies. So the next question might be, and, you know, as I explained, they're excused under state law. So we did allow those to be excused. Separate inquiry from whether FAPE was denied. And so, you know, you look at, so she mentioned occupational therapy. We were excused, you know, to go to that. We were providing occupational therapy at the school, at the district. That was provided as one of her services. You look at ABA therapy. None of the seven evaluations said that ABA therapy was necessary, required of any of the evaluators who are professionals. So this was, again, a unilateral determination by mom that these therapy appointments were necessary. And that's her right to take her child to these therapy appointments. However, you can't then say the district denied the child FAPE. And the Corpus Christi case that we quote in our brief is very clear on that. They say a parent cannot be rewarded in due process for failing to access services and programs that are provided for a student. And so it's very clear. You can't just completely ignore and take out of the equation the fact that we were missing 65%, 50%, 71% of school days. Even the best of teachers would struggle to teach a child to read under those circumstances. And so she was making marked progress. And you mentioned earlier, Judge, that at the time the student was withdrawn, that's the relevant time. Making A's, making B's. Teachers are saying, she's a joy to have in class. She's wonderful. They wished all their kids were like her. And so this is an important decision today because the question is going to be, do we take a child who's thriving, who's an A and a B student, whose teachers are saying, she's a joy, boy, no behavioral problems. I think one of her teachers says, she walks in every day ready to help. That's the student we all wish we had. And because the mother unilaterally believes that private school is superior or better, that doesn't raise an obligation under the idea for the public school to pay for it at public expense. And so the mother has the right to put her in that private placement. It doesn't raise the obligation under the idea for reimbursement. So second requirement you look at under Michael F, least restrictive, least restrictive environment. And that simply means educated to the greatest extent possible with non-disabled peers. And so how did we do that? The student was in the general education environment. The student had inclusion support. And so as a district, we're required to provide a continuum of services. And under the Burlington case, the U.S. Supreme Court said, we have to start in the general ed environment of the public school. And we move from there. If that's not possible, we move up the continuum, resulting finally with the idea does provide for private school at public expense. When that's not possible. When all these steps in the continuum are not possible. So what are some of those steps? What do those look like? Well, she was in the general education environment. And as Your Honor mentioned earlier, you know, Colleen ISD had 11% disabled students at all times. Never over 11% during the time that the student was in our district. And so a 40% argument, even if that was valid, even if that was the test for, you know, a percent, just a pure percentage, I mean, obviously more disabled students at this private placement. And so we went from this least restrictive environment, from the general ed environment with inclusion support, and by the end we were recommending 60 minutes, I believe, in math and English inclusion support. So we had upped it at that last hour. That's what we had recommended. And it was not accepted by the mother, but that's what we had recommended. And we moved to the very most restrictive environment with no stop in between. We moved to private school with a request for public expense, that it be paid at public expense. And that's directly contrary to what Burlington and all the IDEA cases litigate says, that we've moved from least restrictive to most restrictive with no stop in between, and then the district has to pay for that. It's not supported in the law. So you move to the third step, coordinated and collaborative. So that's the third requirement under Michael F., that the IEP was provided in a coordinated and collaborative environment. Would have been a pretty hard task to find much more of a coordinated or collaborative environment than the one we provided. We had eight ARD meetings in two years, like I said. Every time the parent requested an independent evaluation, it was granted. We had advocates at our meetings, we had attorneys come for the parents to represent the parents for the meetings. They all had their say. They all had their input into the IEP. And then you have, I think it was the second to last ARD, we even said, hey, let's put together a collaboration plan. Let's collaborate with these outside experts that the mother has, and let's see if we can all get on the same page for the student. And the mom denied permission. She wouldn't allow the school district to consult with her experts or with her outside specialists. And so the district really did make a bona fide attempt to be collaborative and coordinated to the greatest extent we could. I think it's important to recognize, though, the Doe v. Defendant case says, collaborative and coordinated means that the parent was afforded a meaningful opportunity to participate in the IEP. Collaborative and coordinated doesn't mean that the district just submits or adheres to a laundry list of demands. And so that's the standard. And then you move to the last requirement, and that's that the student show academic benefit and non-academic benefit. Academic benefit, I already said. The relevant time is when this child was pulled out of our school district. It's not in an October 2011 ARD that was outside of the statute of limitations. And aside from that, that argument fails anyways, because if you look at the record, even at that time, if we're going to say the statute of limitations never even applied, if you look at that time period, the student was making progress. Educators testified in spite of the fact that she was missing 65, 50, 71% of the days. And I think one of her special education teachers said just that in the record. I was surprised at how much progress she was able to make in spite of how little she was at school. And so the time that this student was withdrawn, a student, a joy to have in class. She's getting marks of excellent, non-academic benefits. She's getting marks of excellent and sitting in her seat, raising her hand. We grade those things in first grade. She's getting along with her peers. So she's showing non-academic benefits as well. And so that's the bottom line, is that the district was able to show that they affirmatively met the Michael F. Actors. We were affirmatively able to show that we provided an appropriate IEP. It's not our burden, but we were able to show it nonetheless. We carried a burden we never had. And so... I'm sorry, Judge. I thought you were going to ask me a question. Okay. The question I have is, if we apply the statute of limitations to exclude the October meetings and the results from those meetings, what effect does that have on the case itself, on the overall case length? Sirs. I'm not sure that the effect would change all that much, Judge, because as I mentioned, the hearing officer applied it, the district court applied it. I think they gave the procedural background, because we all saw how convoluted that record was. So I think they gave it just as an aid, this is what's happened for this child. But I'm not sure the outcome is much different, because, number one, at every level it's been applied. And even if it wasn't applied, I don't think the outcome would be different, because the student was showing progress. The student was, by the end of the year, that 11-12 school year, she was passing. She had two classes, I think, reading and writing. If we assume that the statute of limitations applies to that, to the October 26th document, does that make it irrelevant in ultimately assessing what has happened here? Or did the district court and the hearing officer take into account that document in assessing the adequacy of the program for this child? Your Honor, I believe that they set out a procedural history, but I don't believe that it was. . . Well, yes, actually let me amend that. I think they did take it into consideration, because they said it applies. Namely, things in kindergarten that we heard about earlier, that certainly doesn't apply. The October 26th piece, I think probably to some extent they had to, just because it builds on history. And so I think they said it doesn't apply. Even if it did, the student still showed the student was making progress. A 70% mastery goal, when the student's passing all of her classes and has two 68s, that's two points away from 70. So we don't set the goal where the student is, of course. That's not a goal. You set it where the student can go. The difference that it makes is that the arguments that they assert on the basis of 70% are irrelevant. Right. The arguments that . . . That, at least, is the effect of the statute of limitations barring the October 26th document. Correct, Judge. I believe that's true. I believe that's true. And so I think that the district court and the hearing officer definitely primarily focused the analysis, the inquiry, on what happened at the time the student was removed from her school. And it makes sense because why would you go back and look to a claim that the IEP was inappropriate over a year before the student was withdrawn from her school? If that was so inappropriate, why was it a year and a half before the student was withdrawn from her school? And when the student was withdrawn from her school, it was a student. And so . . . What was the expense of the private school? Your Honor, I apologize. I do not know the answer to that. I do not know a number of values. That might be a good question for appellant. I'm not exactly sure. And so just to summarize, any of the issues that were brought up that were supposed mistakes of fact that the hearing officer made, and appellant did focus primarily on the hearing officer. I think the alleged mistakes of fact were primarily, if not all, against the hearing officer. She doesn't really allege a whole lot against the district court making mistakes of fact. But even for the sake of argument, let's say, let's consider those. Let's consider them. They don't make any difference. And I would contend that the hearing officer cited the record correctly. I would contend that the IEE, for example, appellant claims he erroneously considered an IEE that was before him. Well, the IEE was put into the record by appellant. So, of course, there's no reversible error for a hearing officer to consider an exhibit that was put in front of him by the appellant. It wasn't us that put that into the record. And he cited it correctly. Another example was he said Exhibit 10 when it should have been Exhibit 19. So while he cited the content of the evaluation appropriately, there was a typo on how he cited it. You know, that's a ring finger and a pinky mistake. That's a typo. And so that's not reversible error. That doesn't raise a material issue. And so nothing that's been raised has any, you know, we talked about the autism in the state law. That doesn't have any effect on whether IDEA was violated, on whether the school district provided FAPE. And so there's really nothing that's been raised as a supposed mistake of fact that would have any material issue. That would raise any kind of essential element. And the essential elements here are the Michael F. cases, or the Michael F. factors. And so those are the essential elements. Do any of those supposed mistake facts have any bearing or any end result on those Michael F. factors? Can it show that we didn't meet one of them? No. None of them have any material effect on the Michael F. factors. And so because of that, as I said, this is just an important case because it's really going to set the stage for whether, if a parent prefers a private school, that a school district is required to pay for it. And when they're thriving under the IEP that the school district's. . . That issue that you just delineated is fairly well settled. I mean, that you provide a private education. . . Right. And that's what we're contending today is that it's well settled. I mean, to that extent, this case is not really going to set out any new guidelines for school districts. We hope not, Your Honor. We really do. Yes. I think you're arguing it would if you didn't follow your argument. That's right. We hope you'll follow our argument. So if you have nothing further of me. . . Thank you, Ms. Mooney. Thank you. Mr. Muniz. Would you address the limitations points that have been made in the briefs? The IEPs that were developed at that October 26th ARD have periods. . . They have dates on there that it's effective. Those were effective until the very next October of 2012. So it doesn't. . . You know, whenever the statute of limitation goes, those IEPs were still in effect. The school district wasn't. . . They couldn't just say, oh, it's beyond a year. I'm not going to implement those IEPs anymore. They were still there. Your position is that nothing in this case is barred by limitation? No, that's not true. It does go back a year, but there were no IEPs in kindergarten. So, you know, they never found her eligible in kindergarten after several attempts by the mother. So, no, there is a statute of limitation. I'm aware of that. But the IEPs in effect, that's the same thing for testing. Testing is done every three years. If you just used a one-year statute of limitation, then that assessment, those evaluations are no good. But that's not true, not in special ed. Those evaluations carry over each year. The child's there until the third year, until a new evaluation is done, just like IEPs. I also want to address a couple of things she mentioned. The district court failed to address the rally standard that the student has to achieve passing marks and advance from grade to grade. This child clearly did not receive passing marks or advance from grade to grade. That's a big material fact that the district ignored. It went straight to the Michael F. Factors. I disagree with her analysis of the Michael F. Factors, and that's what I was going to discuss earlier, and I was going to discuss especially the individualized to meet her needs. Despite all the evaluations that the district did, her IEP was still the same as every regular ed child in her classroom. She had the same standard. Now, she did have additional modifications, but those are modifications that any teacher would tell you, I do these anyway for my kids. And those modifications were the same modifications she had when she was eligible as an ADH child. They did not change when she got the eligibility of autism, which is a difference in disabilities, a big difference. And it remained the same all the way until she withdrew. The accommodations were still the same. They never changed despite all those evaluations. So what is basically your complaint? I mean, is it not enough time was allotted for this child's individual attention? No, the IEP was not individualized to meet her needs. I know, but I don't understand that general broad statement. Yes. Tear it down. What are you really complaining about here? Why was it inadequate? She didn't receive sufficient instruction in reading. She didn't read. Okay, are you saying it's because she didn't get enough time? The teacher failed? The teacher was inadequate? The teacher was incompetent?  She didn't get enough time. There is a continuum of services. She should have been pulled to a resource room and worked one-on-one with reading. That she got at the private school. Did her mother ever raise that with her? Yes. And what was the response of the school district? Her IEP is the same. They never changed her IEP, that she be in the regular ed classroom and have the same standards that everybody else did. Well, of course, one of the requirements is if you're in the least restricted environment, too. Right, and exactly. But she wasn't successful in her, what the district is calling the least restrictive environment. And even in retaining her, then she was a year older than all her peers. Her least restrictive environment would be with her peers, her same-aged peers. That didn't happen. I also want to clarify, there were several evaluations that showed learning disabilities. You're saying that what you're focusing on is that she did not get attention in reading by being taken from the class of other students and given how much instruction was she to be given in this reading room? Whatever the art was to determine. It wasn't just reading, it was also math. Eventually they agreed with the math, but they still didn't provide sufficient services. But it was available for them to provide. Yes. They were providing it for other children. I'm assuming, yes. They have to offer a continuum of services. Okay. Thank you very much. We have the case as well as we're going to get it, I think.